**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Mescal N. Urich and
D. Lynne Daniels,

        Plaintiffs,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 07-1309 ADM/JSM

Mid-Minnesota Legal Assistance,

        Defendant.

_____

William F. Mohrman, Esq., Mohrman & Kaardal, P.A., Minneapolis, MN, argued on behalf of Plaintiffs.

Sara Gullickson McGrane, Esq., Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN, argued on behalf of Defendant.

_____

## I. INTRODUCTION

On May 8, 2008, the undersigned United States District Judge heard oral argument on Defendant Mid-Minnesota Legal Assistance's ("MMLA") Motion for Summary Judgment [Docket No. 33]. Plaintiffs Mescal N. Urich ("Urich") and D. Lynne Daniels ("Daniels") assert claims of discriminatory failure to promote on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.03, subd. 42, 363A.08, subd. 2(c). MMLA's Motion is granted.

## II. BACKGROUND[1]

MMLA is a non-profit corporation providing legal services to low-income individuals and persons with disabilities. Haukedahl Aff. [Docket No. 44] ¶ 2. MMLA provides services in Minneapolis through the Legal Aid Society of Minneapolis ("LASM"), a non-profit corporation. Id. LASM has offices in downtown Minneapolis (the "downtown office"), north Minneapolis (the "northside office"), and south Minneapolis (the "southside office"). Id. MMLA is an umbrella corporation and LASM is a member corporation of MMLA. Haukedahl Dep. (Mohrman Decl. [Docket No. 47] Ex. 8; 2d McGrane Aff. [Docket No. 54] Ex. C) at 13-14. Individuals who work in LASM's offices are employees of MMLA rather than employees of LASM. Id. at 14.

Since November 1985, MMLA has employed Urich as a legal secretary at LASM. Urich Dep. (1st McGrane Aff. [Docket No. 43] Ex. A; 2d McGrane Aff. Ex. B) at 13-14. Urich's duties as a legal secretary include: typing legal documents and correspondence for attorneys; maintaining client files; calling clients to set up appointments; contacting court staff; providing back-up support for the receptionist, including answering phones and mail; and arranging for couriers to deliver documents. Id. at 17-18. From 1985 to 1995, Urich worked in LASM's downtown office. Id. at 14. In 1995, Urich transferred to LASM's southside office. Id. Urich is an American Indian woman.

From 1985 until late 1987, Daniels was a legal secretary in LASM's downtown office. Daniels Dep. (1st McGrane Aff. Ex. B) Ex. 1 at P105. From October 1987 through 1991,

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Daniels was the supervising secretary for the downtown office. Id. Ex. 1 at P103. Daniels supervised eleven secretaries and a volunteer. Id. Ex. 1 at P103. In 1992, MMLA restructured LASM's downtown office and eliminated Daniels' supervising secretary position. Id. Ex. 1 at P104. Daniels resumed working as a legal secretary in the downtown office. Id. Ex. 1 at P104. In October 1998, Daniels began working as the northside office's network administrator. Id. Ex. 1 at P101-P102. In 2003, Daniels transferred to a legal secretary position in the southside office. Id. Ex. 1 at P101. Daniels is an African-American woman.

MMLA has restructured the staffing at LASM in recent years. In 2002, MMLA created a new position of deputy director to manage the day-to-day operations of all three LASM offices. Haukedahl Dep. Ex. 100 at 2. Previously, the managing attorney in each LASM office was responsible for the day-to-day operations of the office. Id. Ex. 100 at 2. MMLA created the deputy director position to make the offices more cohesive. Id. Ex. 100 at 2. Catharine Haukedahl ("Haukedahl") was hired to work as LASM's deputy director. Id. at 5, 8-9.

In March 2003, MMLA implemented Haukedahl's recommendation that MMLA reorganize LASM by substantive units rather than by location. Id. at 11-12. Prior to the reorganization, legal secretaries and other support staff in the southside and northside offices reported to the managing attorneys of those offices, and the managing attorneys reported to Haukedahl. Id. at 12-13. Support staff in the downtown office reported to Lisa Cohen ("Cohen"), who was LASM's director of administration. Id. at 12-13. After the reorganization, Cohen supervised the legal secretaries and other support staff in all three LASM offices. Id. at 13. Later in 2003, Cohen transferred direct supervisory authority over secretaries in the downtown office to Barbara O'Connell ("O'Connell"), who was the office manager in the

3

downtown office. Cohen Dep. (Mohrman Decl. Ex. 19) at 8-9; Haukedahl Dep. at 105-06. In her reconstituted office manager position, O'Connell was responsible for evaluating the performance of support staff in the downtown office. Cohen Dep. at 8-9.

In 2004, a peer review team of experienced legal services administrators evaluated LASM's organization structure. Haukedahl Dep. at 15-16. In December 2004, the peer review team issued a report concluding that LASM's director of administration had too many responsibilities. Id. at 16. MMLA's management committee discussed the report and decided that the director of administration should no longer supervise support staff in the southside office. Id. at 16-17. Haukedahl agreed to supervise the southside support staff until MMLA's management determined where to assign those duties. Id. at 19-20. In a January 13, 2005, email, Haukedahl and Cohen notified the southside office of the changes. Id. Ex. 101. The email stated in part that:

> [T]he Management Committee has decided that the supervision of [southside] support staff should be transferred from Lisa [Cohen] to Cathy [Haukedahl] for a period of time, perhaps up to one year. During that time, we will work to develop the [southside] office manager position into a position that supervises and evaluates the SS support staff on a day-to-day basis, similar to the supervision of [downtown] support staff by Barb O'Connell. This does not necessarily mean that the office manager position will be held by one person; it could continue to be a shared position. The details of how the transition of the office manager position will occur will not be decided until there is opportunity for input by affected staff. We expect the transition from Lisa to Cathy to start on February 1. . . .

Id. Ex. 101.

Christie Lord ("Lord") was the long-time office manager of the southside office. In 1984, Lord began working at LASM as a legal secretary. Lord Dep. (1st McGrane Aff. Ex. E; Mohrman Decl. Exs. 2-3) at 35. In August 1987, Lord was elevated to the position of southside office manager. Haukedahl Aff. ¶ 5, Ex. 2. As of January 2005, Lord worked a seventy percent

schedule. Lord Dep. at 108.

When Lord was out of the office, Virginia Carr ("Carr"), the southside office's network administrator, performed Lord's duties as office manager. Carr Dep. (1st McGrane Aff. Ex. F; Mohrman Decl. Ex. 1) at 34-39. Carr began working in the southside office in 1986 or 1987. Id. at 7. Carr was elevated to the southside network administrator position in October 1994. Haukedahl Aff. Ex. 1. Carr worked an eighty percent schedule. Carr Dep. at 23. Carr testified that on a normal day she spent eighty percent of her time performing network administrator functions and twenty percent on legal secretary work. Id. at 29.

The job duties of the southside office manager position were: delegating work among the legal secretaries; ensuring redistribution of work among the legal secretaries when there was overflow work or when a secretary was out of the office; coordinating legal secretaries' work and vacation schedules to ensure adequate staffing; consulting management regarding hiring and training new support staff; providing feedback to management regarding the performance of the legal secretaries; ensuring adequate information exchange between the legal secretaries and the rest of the office; ensuring that legal secretaries had adequate training; maintaining the legal library; bookkeeping for petty cash and client trust accounts; ordering supplies for the office; calling appropriate personnel to maintain office equipment; acting as a liaison with building management for building repairs and related issues; ordering business cards and arranging for messenger service; ensuring that filing and storage systems are maintained; performing back-up secretarial duties when necessary; and providing on-site technical support if other personnel

were not available. Lord Dep. at 20-36; Carr Dep. at 38. As of January 2005, neither Lord nor Carr formally evaluated support staff. Lord Dep. at 23-24; Carr Dep. at 69.

On January 20, 2005, Cohen and Haukedahl met with Lord and Carr to discuss options for supervising the southside office's support staff. Haukedahl Dep. at 23-27. One option was for Haukedahl to continue to supervise the support staff indefinitely. Id. at 26-27. Another option was to reconstitute the office manager position to include supervising the southside office's support staff. Id. at 27. Haukedahl asked Lord and Carr to think about whether they would like to job-share the reconstituted office manager position. Id. at 52-53. Cohen and Haukedahl also notified Lord and Carr that Carr's technical support duties would be centralized in the downtown office. Carr Dep. at 109-110.

Immediately after the January 20, 2005, meeting with Lord and Carr, Haukedahl and Cohen invited all southside support staff to a meeting to discuss possible changes. Haukedahl Dep. at 23. Haukedahl, Cohen, Carr, Lord, Urich, Daniels, and Patricia Brown ("Brown"), who was a legal secretary, attended the meeting. Id. at 24-25. Haukedahl and Cohen discussed the options that management was considering for supervising the southside office's support staff. Id. at 58. Haukedahl and Cohen stated that if management decided to reconstitute the office manager position, Lord and Carr could job-share the position if they agreed to the additional responsibilities. Id. at 58-59. Otherwise, Haukedahl would continue to supervise the support staff until there was a vacancy within the LASM support staff. Id. at 59. When a vacancy occurred, MMLA would post the vacant LASM southside office manager position and accept applications. Id. Haukedahl testified she asked the attendees for feedback but she never heard from Brown, Daniels, or Urich. Id. at 58-59.

Whether the possibility of any of the legal secretaries applying for the reconstituted office manager position was discussed at the January 20, 2005, meeting is subject to varied recollection. Urich testified that Haukedahl and Cohen announced at the January 20, 2005, meeting that Lord and Carr had accepted the reconstituted office manager position. Urich Dep. at 90. Brown testified that Cohen and Haukedahl told meeting attendees that others could apply for the reconstituted office manager position. Brown Dep. (Mohrman Decl. Ex. 12) at 47. Brown avers that Haukedahl subsequently asked her if she was interested in the position, to which Brown responded "absolutely not." Id. at 48. Brown also testified that she asked Urich if she was interested in the position, and that Urich responded that she would not apply. Id. at 48-49.[2] Haukedahl testified that neither Urich nor Daniels said anything at the meeting, and she did not recall whether Brown asked any questions. Haukedahl Dep. at 59-60.

In February 2005, Lord and Carr notified Haukedahl and Cohen that they would like to job-share the reconstituted office manager position. Haukedahl Dep. Ex. 118. Carr and Lord inquired whether the southside office manager position could be reclassified under MMLA's payscale to reflect the additional responsibilities of the reconstituted position. Cohen Dep. at 9-10. MMLA pays its employees based on their position and their years of service. Mohrman Decl. Ex. 25. As of early 2005, Lord and Carr were both paid as office managers on MMLA's salary chart. Haukedahl Aff. Exs. 1-2. Office managers are one level above legal secretaries on MMLA's salary chart. Mohrman Decl. Ex. 25. The next level above office manager is

---

[2] Plaintiffs have submitted post-deposition declarations stating their recollections of the January 20, 2005, meeting. Daniels Decl. [Docket No. 48]; Urich Decl. [Docket No. 49]. Plaintiffs' declarations repeat the allegations in their Complaints. Compare Daniels Decl. and Urich Decl. with Urich's Complaint [Docket No. 1] and Daniels' Complaint [Docket No. 10]. The Court will not consider Plaintiffs' declarations for the reasons discussed in Part III-B below.

administrative assistant.  Id. Ex. 25.  After reviewing the duties of the reconstituted southside office manager position, Haukedahl and Cohen prepared a February 18, 2005, memorandum recommending that LASM executive director Jeremy Lane ("Lane") reclassify the reconstituted southside office manager position to the administrative assistant level.  Haukedahl Dep. Ex. 118.  Lane approved reclassification of the southside office manager position.  Id. at 18, 54.

In a March 7, 2005, email, Haukedahl notified the southside office that Lord and Carr would job-share the reconstituted southside office manager position effective immediately.  Id. Ex. 120.  Brown testified that Haukedahl convened a meeting to discuss Lord and Carr's new duties.  Brown Dep. at 56-58.  Brown avers that Urich inquired whether Haukedahl thought Urich was qualified for the reconstituted office manager position.  Id. at 57-58.  Brown testified that Haukedahl responded that Urich was qualified, but Brown could not recall anything else from the alleged exchange between Haukedahl and Urich.  Id. at 58.  Haukedahl testified that neither Urich nor Daniels voiced any disagreement that Lord and Carr would fill the reconstituted office manager position.  Haukedahl Dep. at 139.

On November 21, 2005, Daniels and Urich filed charges of discrimination in the Minnesota Department of Human Rights ("MDHR").  Daniels Dep. Ex. 2; Urich Dep. Ex. 4.  In January 2007, the MDHR determined there was no probable cause to believe that MMLA had engaged in an unfair discriminatory practice.  Daniels Dep. Ex. 3.  Plaintiffs timely initiated this litigation on February 23, 2007.[3]  Plaintiffs asserted claims of discriminatory failure to promote and a discriminatory salary cap in violation of Title VII and the MHRA.  The parties have

---

[3] Plaintiffs filed two civil actions.  The actions were subsequently consolidated into one action.  May 31, 2007, Order [Docket No. 9].

stipulated to dismissal with prejudice of Plaintiffs' discriminatory salary cap claims. Stipulation [Docket No. 58].

## III. DISCUSSION

### A.   Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.   Plaintiffs' Declarations

Plaintiffs have filed declarations in opposition to MMLA's Motion for Summary Judgment. Daniels Declaration; Urich Declaration. These declarations essentially repeat the allegations asserted in Plaintiffs' Complaints. Specifically, Plaintiffs' declarations assert that during the January 20, 2005, meeting, Urich asked Haukedahl and Cohen whether they thought the Plaintiffs were qualified and could apply for the reconstituted office manager position. Daniels Decl. ¶ 24; Urich Decl. ¶ 21. Plaintiffs state that Haukedahl responded that Plaintiffs were qualified but they could not apply because they "were at the legal secretary level and not

9

the office manager level." Daniels Decl. ¶ 25; Urich Decl. ¶¶ 21-22. Plaintiffs allege that Haukedahl and Cohen stated that if Lord and Carr did not accept the position, MMLA "would hire from the outside." Daniels Decl. ¶ 26; Urich Decl. ¶ 23. Plaintiffs also assert that Lord stated "that neither she nor Carr wanted the [reconstituted office manager] position but [MMLA] forced them to accept it." Daniels Decl. ¶ 29; Urich Decl. ¶ 26.

MMLA argues the declarations should not be considered because they present factual allegations and documentary evidence that were not disclosed during discovery. This Court agrees. Federal courts have long recognized that deposition testimony is inherently more reliable than affidavits or declarations because "the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination." Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). The purpose of taking depositions during discovery is thwarted if a party can withhold testimony during a deposition and then defeat summary judgment by offering the withheld testimony through an affidavit or a declaration. Plaintiffs had the opportunity to testify regarding the facts relevant to their failure-to-promote claims, but have inexplicably failed to provide any deposition testimony of the facts discussed in their declarations. Although post-discovery affidavits and declarations may be

useful to clarify ambiguous deposition answers and to present undisputed background facts, they may not be used as a substitute for a party's deposition testimony. The Court will not consider Plaintiffs' declarations.[4]

## C.  **Plaintiffs' Failure-to-Promote Claims**

### 1.  Title VII

Title VII prohibits an employer from "limit[ing], segregat[ing], or classify[ing] his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  A plaintiff asserting a Title VII employment discrimination claim can survive summary judgment by presenting direct evidence or indirect evidence of discrimination.  Direct evidence of discrimination includes "actions or remarks by the employer that reflect discriminatory intent."  Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 859 n.9 (8th Cir. 2005).

"If a plaintiff lacks direct evidence, the McDonnell Douglas framework applies."  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  "[T]he McDonnell Douglas framework exists to provide discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory

---

[4] Portions of Plaintiffs' declarations are inconsistent with excerpts of their deposition testimony that MMLA has provided. For example, Daniels and Urich assert that at the January 20, 2005, meeting, Urich asked Haukedahl and Cohen whether Urich and Daniels could apply for the reconstituted office manager position. However, when asked if she told anyone in January 2005 that she wanted the position, Urich testified she did not know a position was available. Urich Dep. at 90. The Eighth Circuit has consistently held that a party cannot defeat summary judgment by submitting an affidavit contradicting her own earlier deposition testimony. Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983).

evidence of discriminatory intent.'"  Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996) (quoting Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 776 (8th Cir. 1995)).  To establish a prima facie case of discrimination in a failure-to-promote case, a plaintiff must show that: "(1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead."  Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 650 (8th Cir. 2001).  If a plaintiff establishes a prima facie case, the burden shifts to the employer to provide evidence "'that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'"  Shannon, 72 F.3d at 682 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)).  If the employer satisfies its burden, the plaintiff must establish the existence of facts that, if proven at trial, would permit a jury to conclude that the employer's proffered reason is a pretext for intentional discrimination.  Krenik, 47 F.3d at 958.

      **a.**      **Direct Evidence**

Plaintiffs argue the McDonnell Douglas framework need not be applied here because there is direct evidence of MMLA's discriminatory intent.  Plaintiffs rely on evidence that Galen Robinson ("Robinson"), MMLA's litigation director, allegedly told Susan Wright, an African-American attorney who worked at LASM from September 2003 to 2006, that MMLA had difficulty recruiting African-American attorneys because of their low bar passage rates.[5]  Wright Dep. (Mohrman Decl. Ex. 20) at 69-70.  However, direct evidence of discrimination does not

---

[5] Plaintiffs suggest that Robinson made the comment some time before August 30, 2004. Pls.' Mem. in Opp'n to Mot. for Summ. J. [Docket No. 46] at 27-28.

include "'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 635 (8th Cir. 1998) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)).  The record reflects that based on Haukedahl and Cohen's recommendation, Lane made the decision to reconstitute the office manager position and appoint Lord and Carr.  Haukedahl Dep. at 54.  There is no evidence that Robinson was involved in the decision.  Therefore, Robinson's stray statement is not direct evidence of discrimination.

    **b.**  **McDonnell Douglas Burden-Shifting Framework**

Because Daniels and Urich are members of protected groups, the first prong of Plaintiffs' prima facie case is satisfied.  The parties dispute the remaining prongs.  MMLA argues the second prong—whether Plaintiffs were qualified and applied for a promotion to an available position—is not satisfied because: (1) Plaintiffs were not qualified for the reconstituted office manager position; (2) Plaintiffs did not adequately express an interest in the position; and (3) there was no available position because Lord and Carr's existing positions were merely reconstituted.  MMLA argues the third prong—whether Plaintiffs were rejected for the position—is not satisfied because Plaintiffs never applied for the reconstituted office manager position and therefore they were not rejected.  Finally, MMLA argues Plaintiffs cannot meet the fourth prong—whether similarly situated employees, not part of the protected group, were promoted—because Plaintiffs were not as qualified as Lord and Carr for the reconstituted office manager position.

Although Plaintiffs may not have established a prima facie case of discrimination, the Court will assume arguendo that Plaintiffs have made a prima facie showing.  Adelman-Reyes v.

St. Xavier Univ., 500 F.3d 662, 665 (7th Cir. 2007) (noting that courts "may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext"). MMLA asserts that it did not consider other candidates for the reconstituted office manager position because Lord and Carr were already performing the vast majority of the duties of the reconstituted position. Plaintiffs do not dispute that MMLA has asserted a legitimate, nondiscriminatory reason. Therefore, the Court proceeds to analyze pretext.

"[The pretext] inquiry is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair or correct." McKay v. U.S. Dep't of Transp., 340 F.3d 695, 700 (8th Cir. 2003) (quotation omitted). There are at least two ways a plaintiff can establish a question of fact regarding pretext. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006). First, a plaintiff can indirectly show pretext with evidence that the employer's explanation is "'unworthy of credence' because it has 'no basis in fact.'" Id. (quoting Burdine, 450 U.S. at 256, and Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002)). Second, a plaintiff can directly show pretext "'by persuading the court that a [prohibited] reason more likely motivated the employer.'" Id. (insertion in original) (quoting Burdine, 450 U.S. at 256).

Lord and Carr had previously performed almost all of the duties of the reconstituted office manager position. Lord Dep. at 20-36; Carr Dep. at 66-78. The only duties they had not performed were formally evaluating the secretaries, and holding regular secretary meetings. Lord Dep. at 23, 27; Carr Dep. at 69, 71-72. The testimony of the Plaintiffs corroborates Lord and Carr's testimony. Urich testified that before March 2005, Lord was "like an administrative assistant," and that Lord "really didn't do legal secretary work." Urich Dep. at 92, 95-96. Urich

stated that the only change she noticed after the office manager position was reconstituted was that Lord "[wr]ote up evaluations on me." Urich Dep. at 93-94. Daniels testified that Lord and Carr "continued on as they were." Daniels Dep. at 84. The only changes that Daniels noticed were that Carr no longer did technical support work; Carr assumed responsibility for ensuring that secretaries had adequate computer training; Lord and Carr assumed responsibility for performance reviews; and Carr held weekly secretary meetings. Daniels Dep. at 84-86. Despite the evidence that Lord and Carr previously performed most of the duties of the reconstituted office manager position, Plaintiffs argue that the written description of the position shows that Lord's job duties changed by fifty percent and Carr's job duties changed by sixty-five percent. Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. at 24. However, Plaintiffs' calculations ignore the substantial evidence that Lord and Carr had performed almost all of the duties of the reconstituted position. Plaintiffs have failed to show that MMLA's proffered explanation for giving Lord and Carr the reconstituted office manager position has no basis in fact.

     Plaintiffs also argue they were more qualified than Lord and Carr. Plaintiffs contend their superior qualifications for the reconstituted office manager position demonstrate that MMLA was more likely motivated by discrimination. However, federal courts cannot "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.1999) (quotation omitted). "While courts do not review the wisdom or fairness of employers' business judgments . . . [courts] may consider whether an employer hired or promoted an individual who was substantially less qualified than an unsuccessful candidate in the protected class." Peterson v. Scott County, 406

F.3d 515, 523 (8th Cir. 2005). The record reflects that MMLA made a business judgment to offer the reconstituted office manager position to Lord and Carr, who were already performing most of the duties of the reconstituted position. Lord and Carr were at the office manager level, a higher salary level than Plaintiffs' legal secretary level. Plaintiffs do not offer any evidence suggesting that their lower salary level relative to Lord and Carr prior to the reconstitution of the office manager position was the result of discrimination. Although Plaintiffs disagree with MMLA's decision to offer the reconstituted office manager position to Lord and Carr, this Court does not review the wisdom or fairness of giving the position to two employees who outranked Plaintiffs and who were already performing most of the duties of the position. See Hudson v. Chicago Transit Auth., 375 F.3d 552, 561 (7th Cir. 2004) (concluding that plaintiff was not similarly situated to promoted employees because the promoted employees had a higher rank at the time they were promoted). Therefore, the Court grants MMLA's motion for summary judgment on Plaintiffs' Title VII failure-to-promote claims.

    **2.**    **MHRA**

The MHRA prohibits employers from "discriminat[ing] against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of race. Minn. Stat. § 363A.08, subd. 2(c). The same standard is used to analyze both Title VII and MHRA claims, and therefore, the analysis of Plaintiffs' Title VII claims applies to their MHRA claims. See Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998). Accordingly, the Court grants MMLA's motion for summary judgment on Plaintiffs' MHRA failure-to-promote claim.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Pursuant to the parties' Stipulation [Docket No. 58], Plaintiffs Mescal N. Urich and D. Lynne Daniels' claims of a discriminatory salary cap are **DISMISSED WITH PREJUDICE**; and

2. Defendant Mid-Minnesota Legal Assistance's Motion for Summary Judgment [Docket No. 33] on Plaintiffs' remaining claims is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 22, 2008.